NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-4466

J.F.; J.F., on behalf of J.F.,
                                        Appellants

v.

BYRAM TOWNSHIP BOARD OF EDUCATION

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-14-cv-05156)
District Judge: Honorable Faith S. Hochberg

Submitted Under Third Circuit LAR 34.1(a)
October 8, 2015

Before: McKEE, Chief Judge, AMBRO, and HARDIMAN, Circuit Judges

(Opinion filed:  October 29, 2015)

OPINION[*]

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

AMBRO, Circuit Judge

## I.

This appeal presents a question about the scope of the "stay-put" provision of the Individuals with Disabilities Education Act ("IDEA"). J.F., a fourteen-year-old boy with learning disabilities, relocated with his family from New Jersey's Westwood Regional School District ("Westwood") to the Byram Township School District ("Byram"). He contends on appeal that the stay-put provision requires Byram to pay for him to remain at a private school outside of Byram during the pendency of a due process petition that he is pressing. We disagree. Byram's obligation under the IDEA is to provide J.F. with services comparable to what he received from Westwood until it either implements the program designed for J.F. by Westwood or designs its own program. The District Court concluded that Byram has met its obligation, and we will affirm.

## II.

Under the IDEA, protected students receive Individualized Education Programs ("IEPs") consistent with their needs. *See* 20 U.S.C. §§ 1412(a)(4), 1414(d). At the time this dispute arose, the last IEP designed for J.F. was created by Westwood in May 2014 and placed J.F. at the Craig School, a private school outside of Westwood, for the 2014–2015 school year. After the creation of the IEP but prior to the start of the 2014–2015 school year, J.F. and his parents relocated from Westwood to Byram. In June 2014, J.F.'s parents registered him with Byram. After reviewing J.F.'s IEP, Byram told J.F.'s parents that it could implement the program in-district. J.F.'s parents attempted instead to have

2

Byram fund J.F.'s placement at the Craig School. To that end, the parents sought mediation in July 2014 from the New Jersey Commissioner of Education. This request was converted into a due process petition. In connection with these proceedings, J.F.'s parents invoked the stay-put provision of the IDEA and requested an injunction requiring Byram to fund J.F.'s placement at the Craig School for the duration of the case. An administrative law judge ("ALJ") denied the motion, and the District Court upheld the ALJ's determination. This timely appeal ensued.[1]

## III.

The IDEA's stay-put provision, 20 U.S.C. § 1415(j), provides that during the pendency of a due process petition, unless there is an agreement otherwise, "the child shall remain in the then-current educational placement . . . ." J.F. argues that the Craig

---

[1] We have jurisdiction over the appeal under 28 U.S.C. § 1291. We exercise plenary review of the District Court's legal conclusions and review factual findings for clear error. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014). Where, as is the case here, the District Court was reviewing an ALJ's opinion, we apply a modified *de novo* standard that gives "due weight" to the ALJ's factual findings, which we consider to be "prima facie correct," as part of our clear error review. *Id.* (internal quotation marks omitted). J.F. argues that this deference to the ALJ's findings only exists when the ALJ has heard live testimony. This is incorrect. Although we give "special weight" to an ALJ's credibility determinations from live testimony, we apply the modified *de novo* standard to all factual findings made by the ALJ. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Finally, because the stay-put provision serves as an automatic preliminary injunction, we review for abuse of discretion the District Court's decision to deny stay-put relief. *See M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013).

School is his "then-current educational placement" because the only IEP in place at the time of the due process petition provided for his enrollment there.

If J.F. had not voluntarily relocated from Westwood to Byram, this case would present a closer question. On the one hand, we have said that the "dispositive factor" in determining the then-current placement is the IEP "actually functioning when the 'stay-put' is invoked." *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996) (internal quotation marks omitted). In *Drinker*, we determined that the school that created the functioning IEP, rather than the school to which the district sought to transfer the student, was the then-current placement. *Id.* This favors J.F. On the other hand, we have also held that the stay-put provision does not prevent schools from making changes that are unlikely to "affect in some significant way the child's learning experience." *DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 153 (3d Cir. 1984). Because Byram intended to implement J.F.'s IEP, it is not clear whether the change would have a significant effect on J.F.'s learning experience.

However, this is a very different case than either *Drinker* or *DeLeon* because both of those cases involved changes initiated by the school district. By contrast, J.F.'s parents unilaterally relocated from Westwood to Byram. In these circumstances, the purpose of the stay-put provision, which is to maintain the status quo in situations where the *school district* acts unilaterally, is not implicated. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 323 (1988) (observing that, in adopting the stay-put provision, Congress "very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school") (emphasis in

4

original); *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1133 (9th Cir. 2003) ("Although the 'stay-put' provision is meant to preserve the status quo, we recognize that when a student transfers educational jurisdictions, the status quo no longer exists."). In *Ms. S.*, the Ninth Circuit, confronting the situation we have here, stated,

> We hold that when a dispute arises under the IDEA involving a transfer student, and there is disagreement between the parent and student's new school district about the most appropriate educational placement, the new district will satisfy the IDEA if it implements the student's last agreed-upon IEP; but if it is not possible for the new district to implement in full the student's last agreed-upon IEP, the new district must adopt a plan that approximates the student's old IEP as closely as possible. The plan thus adopted will serve the student until the dispute between parent and school district is resolved by agreement or by administrative hearing with due process.

337 F.3d at 1134.

We agree with this approach, except we conclude that the relevant test for a school district's compliance is found not in the wording of the *Ms. S.* decision but instead in a provision that Congress added to the IDEA the year after *Ms. S. See* 20 U.S.C. § 1414(d)(2)(C)(i)(I) ("In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.").[2]

---

[2] The Ninth Circuit's test is similar, but not identical, to § 1414(d)(2)(C)(i)(I) and was based on regulatory guidance that predated the codification. Additionally, although the

5

Although the IDEA does not, by its plain terms, discuss whether the stay-put provision imposes requirements above and beyond § 1414(d)(2)(C)(i)(I), we have previously held, in the context of interstate transfers, that unilateral relocations by parents can override the provision. *See Michael C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 651 (3d Cir. 2000) ("However, where a *parent* unilaterally removes a child from an existing placement determined in accordance with state procedures, and puts the child in a different placement that was not assigned through proper state procedures, the protections of the stay-put provision are inoperative until the state or local educational authorities and the parents agree on a new placement.") (emphasis in original).

In *Michael C.*, we held that the procedures set forth in a memorandum from the Office of Special Education Programs governing interstate transfers fixed a school district's obligations and superseded the stay-put provision even though the memorandum did not specifically state that the procedures overrode § 1415(j). *Id.* at 648–50. Although *Michael C.* had its roots in interstate comity concerns not present in intrastate moves, *id.* at 651 n.7, the key point for our purposes is that we held the stay-put provision yields to other procedures governing transfers. Congress explicitly provides those procedures for intrastate transfers in § 1414(d)(2)(C)(i)(I). We therefore hold that, because J.F.'s parents

---

transfer here took place between school years, we still apply the test in § 1414(d)(2)(C)(i)(I) because the transfer post-dated the creation of the IEP for the new school year. The situation therefore resembles a mid-year transfer.

unilaterally relocated him from Westwood to Byram, the stay-put provision is inoperative and Byram meets its obligation by complying with § 1414(d)(2)(C)(i)(I).[3]

### IV.

The question remains whether Byram has met its obligation under § 1414(d)(2)(C)(i)(I). The ALJ and the District Court both found that Byram offered services comparable to those provided for in the Westwood IEP. *See* JA 7–8, 198. J.F. disputes this conclusion but does not raise any new arguments on appeal, and we find no clear error. Of course, the requirements of § 1414(d)(2)(C)(i)(I) extend beyond the initial provision of comparable services and require the implementation of the existing IEP or the creation of a new one. J.F. maintains that this has not occurred. However, both the ALJ and the District Court found that J.F.'s parents refused to cooperate with Byram over any placement other than the Craig School. *See* JA 3 n.1, 198. We find no clear error of fact. As a result, we cannot say under these circumstances that Byram failed to meet its obligation, and the District Court did not abuse its discretion in declining to grant an injunction requiring placement at the Craig School.

For these reasons, we affirm.

_____

[3] We note that under our holding Byram does have the authority to determine J.F.'s placement pending the resolution of the dispute. But this is only triggered by J.F.'s parents' unilateral decision to relocate. The "trade-off"—requiring compliance with § 1414(d)(2)(C)(i)(I) but not mandating placement at the student's former school—of our approach is "considered necessary in those circumstances where a child chooses to move to a new school district." James Rapp, Education Law, § 10C.10[2][c][ii] (Matthew Bender & Co. 2015). *See also id.* ("Accordingly, while the new district is required to provide services comparable to those described in the previously held IEP, the IDEA does not compel allowing a student to continue at the student's current brick-and-mortar placement.") (internal quotation marks omitted).